USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: JAN 30 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT REIVES,

           Plaintiff,

-against-

ELGIN BAYLOR LUMPKIN p/k/a
GINUWINE,

           Defendant.

No. 08-CV-7797 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Robert Reives ("Reives") brings this action against Defendant Elgin Baylor Lumpkin ("Lumpkin") for breach of contract. Reives alleges that Lumpkin, known professionally as the musical artist Ginuwine, failed to make payments as required under a 1996 Management Agreement (the "Management Agreement"), which appointed Reives as Lumpkin's manager. Lumpkin raises the affirmative defenses of abandonment and waiver, arguing that the parties mutually agreed to dissolve their professional relationship in late summer of 1996, less than a year after entering into the Agreement.

After a one-day bench trial held on November 10, 2014, and for the reasons below, the Court finds that the Management Agreement was mutually abandoned by the parties in late summer of 1996. The Court further finds that this abandonment of the Management Agreement precludes Reives' present action for breach of contract. Accordingly, the Court renders judgment in favor of Lumpkin, and awards all permissible costs accordingly.

# FINDINGS OF FACT

## I. Stipulated Findings of Fact

The Court adopts as findings the following facts, to which the parties stipulated in their Joint Pre-Trial Order:

1. Plaintiff Reives and Defendant Lumpkin entered into the Management Agreement (Mgmt. Agreement (Dkt. 83 Ex. A)) on February 13, 1996.

2. Reives furnished the Management Agreement to Lumpkin for signature, who signed it and initialed the pages without otherwise altering its text. The other underlining and handwriting on the document were placed there by unknown third parties and do not form a part of the parties' agreement.

3. As a result of Reives' efforts, Lumpkin entered into a recording contract with Sony Music on March 11, 1996. (Recording Contract (Dkt. 83 Ex. L).)

4. The Recording Contract was amended on five occasions: November 1996, January 1998, July 1998, June 2000 and July 2002. (Dkt. 83 Ex. L.)

5. Reives had no role in securing or representing Lumpkin with respect to any of these amendments.

## II. Additional Findings of Fact

Pursuant to Fed. R. Civ. P. 52, the Court makes the following additional findings of fact on the basis of testimony and exhibits presented at trial, as well as the depositions taken by the parties,[1] all of which were made a part of the record in this case. I also adopt herein any subsequent Conclusion of Law that may more properly be deemed a Finding of Fact.

---

[1] Reives Aug. 29, 2012 Dep. ("Reives Dep.") (Dkt. 54 Ex. P); Reives Oct. 16, 2013 Dep. ("2d Reives Dep.") (Dkt. 83 Ex. S); Lumpkin July 26, 2012 Dep. ("Lumpkin Dep.") (Dkt. 54 Ex. Q).

### *Events Leading to the Management Agreement*

Reives and Lumpkin first met in New Jersey around 1992 or 1993. (Trial Tr. 121:20–21; Lumpkin Dep. 7:22–8:3.) At the time, Reives was working as an artist and repertoire ("A&R") manager for Donald DeGrate (a/k/a DeVante) (Reives Dep. 9:22–10:8), a well-known producer and artist, while Lumpkin was working as one of DeGrate's artists, (Trial Tr. 122:2–4). At some point prior to 1996, Reives decided to develop his own roster of artists, and began conversations with Lumpkin, as well as at least two other artists, about becoming their manager. (Reives Dep. 11:3–19.) As a consequence of these conversations, Reives and Lumpkin entered into the Management Agreement on February 13, 1996. (Trial Tr. 123:3–124:14.)

Reives did not draft the Management Agreement, nor can he recall who provided the agreement template to him. (Trial Tr. 13:12–21, 79:14–16.) Prior to signature, the draft template was modified to include Reives' and Lumpkin's home addresses, as well as both parties' names, but was otherwise left untouched. (Trial Tr. 80:8–16.) Reives could not recall who made these modifications to the template, only that it might have been Jimmy Douglas, a recording engineer with whom he was working at the time. (Trial Tr. 80:8–16.) Neither party read the Management Agreement in any meaningful way prior to signature, nor was either party advised by an attorney. (Trial Tr. 120:6–9, 124:5–125:8.)

### *The Management Agreement*

In the Joint Pre-Trial Order they submitted, the parties stipulated that the Management Agreement is unambiguous and speaks for itself as to its terms. Accordingly, I interpret the express terms of the Management Agreement to provide as follows, as is relevant here:

3

- The Management Agreement's initial term was three years. (Mgmt. Agreement § 2 ¶ 1.) Following this initial three-year term, the Management Agreement was to automatically renew for either two or three one-year terms.[2] (Id. § 2 ¶ 2.)

- The Management Agreement automatically renewed unless the parties provided written notice of their intent to terminate the Agreement. (Id.) No written notice was required for renewal. (Id.) Written notice was only required if the parties elected not to renew the Management Agreement for these additional one-year terms. (Id.) There was, however, no express provision requiring written notice for termination during the initial, three-year period of the Agreement.

- The Management Agreement designated Reives as Lumpkin's "sole and exclusive career manager" during the Agreement's term (id. § 1), and barred Lumpkin from engaging "any other person or entity to act for [him] in any capacity for which [he] ha[d] engaged [Reives] hereunder," (id. § 3 ¶ 5). The Agreement required Lumpkin to request Reives' services in writing, and without such a request, Reives was not otherwise required to perform any substantive managerial duties. (Id. § 3 ¶ 4.)

- During the term of the Management Agreement, Reives was to receive twenty percent of "any and all gross monies or other considerations which [Lumpkin] may earn, receive, acquire, or become entitled to, as a result of [Reives'] activities." (Id. § 4.) The term "gross monies or other considerations" was expressly defined to include "royalties," among other sources of income. (Id. § 5.) Lumpkin was required to promptly pay Reives his percentage

---

[2] The Management Agreement is ambiguous on its face as to the number of renewal periods, providing: "the term hereof shall automatically continue for three (2) additional periods of one year after the close of the initial term . . . ." (Id. § 2 ¶ 2.) Because the Court finds that the Management Agreement was mutually abandoned prior to the close of the three-year initial term, however, it is unnecessary to resolve this ambiguity.

4

upon receipt of any "gross monies," and the Agreement granted Reives a continuing lien on any delayed payments. (Id. § 4.)

- The Management Agreement granted Reives a "continuous interest" in this compensation, and barred Lumpkin from revoking this interest at his pleasure. (Id. § 7 ¶ 1.) The Management Agreement further provided that "all arrangements, agreements, understandings or other commitments made during the active term of [the] Agreement" were to be "subject to" Reives' interest. (Id.) This provision only applied, however, to the extent the Management Agreement remained in effect. (Id.)

- The Management Agreement required those notices "which either party shall be required or desired to give to the other hereunder" to be in writing. (Id. § 10.)

- No provision squarely addressed how the parties were to terminate the contract during its pendency, and none expressly barred Reives or Lumpkin from orally abandoning, terminating, or otherwise modifying the Management Agreement.

### The Parties' Performance Under the Management Agreement

Upon signing the Recording Contract in March of 1996, Lumpkin began recording "The Bachelor," his first album (Trial Tr. 126:17–19, 127:17–19), for which Reives served as Executive Producer, (Lumpkin Dep. 62:9–11). Reives waived his initial right to payment under the Management Agreement so that Lumpkin could receive a $50,000 advance from Sony Music under the Recording Contract. (Reives Dep. 91:4–10.) Specifically, Reives told Lumpkin: "just pay me later on. When we get settled, you can pay me my advance—pay me my 20 percent commission then." (Id.)

Lumpkin finished recording "The Bachelor" in mid-May of 1996. (Trial Tr. 127:22–25, 130:10–11; Lumpkin Dep. 23:4–16.) In advance of the album's release, through July of 1996,

Reives helped oversee the selection and design of album artwork and the development of video concepts, in addition to setting up several promotional concerts. (Trial Tr. 15:9–16:24; Reives Dep. 99:2–100:10.) It is unclear whether Lumpkin specifically requested these services, but Reives acknowledged in his first deposition that all of these activities occurred prior to the release of "The Bachelor" on October 8, 1996. (Reives Dep. 99:2–100:10.)

***The Parties' Mutual Abandonment of the Management Agreement***

Around this time, Sony Music executives first suggested to Lumpkin that they were frustrated with Reives' conduct as manager and threatened to "shelf [sic]" Lumpkin (i.e. delay the release of his album) if Lumpkin did not retain new management. (Trial Tr. 128:18–24, 129:10–17.) Specifically, a Sony Music executive told Lumpkin that Reives had appeared "irate," "loud," and "disrespectful" in several meetings, and that he was not someone with whom they "wanted to work things out." (Lumpkin Dep. 51:10–20.)

Although the relationship between Reives and Lumpkin never became particularly acrimonious, Lumpkin did grow frustrated with what he described as Reives' lack of professionalism, including his frequent tardiness, and eventually concluded that Reives did not have his best interests at heart and might compromise his opportunity for success. (Trial Tr. 129:20–130:7; Lumpkin Dep. 70:3–72:8) In particular, Lumpkin grew frustrated with feeling that Reives "was the artist and [Lumpkin] was the manager." (Lumpkin Dep. 39:12–40:3.) At times, Reives would become so upset about not getting his way in the recording process that he would leave the studio for hours, or even for days. (Lumpkin Dep. 39:12–40:3, 41:8–17.)

Consistent with this growing frustration, on June 7, 1996, Lumpkin sent Sony Music a letter directing them to pay to Reives a one percent royalty for sales of "The Bachelor"—a royalty that otherwise would have been paid to Lumpkin under the terms of the Recording Contract. (Dkt.

83 Ex. B ("Letter of Direction").) The intent of this "Letter of Direction," Lumpkin testified, was to compensate Reives for his work in procuring the Recording Contract, and for his role as Executive Producer on "The Bachelor." (Trial Tr. 144:19–146:3.) According to Lumpkin, however, the Letter's other purpose was to "let [Reives] go away" and to "move him to the side." (Trial Tr. 145:4–9.) The execution of the Letter of Direction occurred after considerable tension between Reives and Lumpkin over whether Reives should get a percentage of the royalties associated with the record. (Lumpkin Dep. 62:21–63:22.) Lumpkin felt that Reives' continued efforts to obtain a percentage were inconsistent with his role as manager, and interfered with Lumpkin's ability to focus on his artistic process. (Id.) Accordingly, Lumpkin and his lawyers drafted the Letter of Direction in the hope that it would "get it over with" and allow Lumpkin to just "get out [of the contractual relationship with Reives]." (Lumpkin Dep. 64:1–16.)[3]

Around the same time, Reives also entered into a separate agreement with Sony Music (the "First Look Agreement"), pursuant to which he was paid a fee for granting Sony a first look at any artists he was developing. (Reives Dep. 120:13–121:6.) Executed by Sony in view of Lumpkin's interests, Lumpkin testified that the First Look Agreement, like the Letter of Direction, was designed to "let [Reives] go away" and to "move him to the side." (Trial Tr. 145:4–9.) Both the Letter of Direction and the First Look Agreement were also consistent with what Lumpkin understood to be Reives' larger ambition in the music industry: to transition from manager to producer. (Trial Tr. 144:19–146:3.) Additionally, they satisfied Lumpkin's sense that Reives was owed something for his work in procuring the Recording Contract. (Id.)

---

[3] Exhibits presented at trial established that, through 2012, Reives earned $269,461.28 in royalties pursuant to the Letter of Direction.

Following the execution of these two agreements, sometime in late summer of 1996,[4] Lumpkin and Reives spoke by phone, at which time the parties had a "heated" conversation that ultimately resulted in a mutual agreement to part ways. (Trial Tr. 130:8–131:5; Lumpkin Dep. 49:1–9.) In making this finding, the Court credits Lumpkin's testimony in his deposition and at trial, and finds—as a matter of fact—that this conversation constituted an express agreement to mutually abandon the Management Agreement.

### *The Parties' Post-Termination Conduct*

Subsequent to their mutual decision to abandon the Management Agreement, both parties engaged in conduct consistent with termination, and Lumpkin believed he had no remaining obligations to Reives. (Trial Tr. 138:23–139:17.) Indeed, even if the late summer 1996 conversation were not to constitute an express agreement to terminate their contractual relationship, the subsequent conduct of the parties is sufficiently inconsistent with the Management Agreement to constitute abandonment.

Consistent with their decision to part ways, Lumpkin hired a new manager, Barry Hankerson, shortly after The Bachelor's release in mid-October of 1996, and it was Hankerson who helped Lumpkin negotiate the first amendment to the Recording Contract that November. (Trial Tr. 130:20–131:5, 132:22–133:17.) Reives' deposition testimony is also consistent with Lumpkin's October 1996 hiring of Hankerson. (Trial Tr. 16:17–24 (noting that he provided

---

[4] In his testimony, Lumpkin suggested the date of this conversation might have been mid-July of 1996. (Trial Tr. 130:8–131:5.) He also indicated, however, that he remembered it happening sometime after his first single "Pony" was released, but prior to the release of "The Bachelor." (Lumpkin Dep. 47:18–49:9.) "Pony" was released on August 20, 1996, and "The Bachelor" was released on October 8, 1996. While Lumpkin's testimony thus evidences the usual frailties of memory, it remains more credible than that of Reives. As to this same period, Reives claimed in his first deposition that the recording process alone for "The Bachelor," which began in March of 1996, lasted between six and eight months. (Reives Dep. 94:17–19, 96:1–3.) This timeline appears to be erroneous, as it would suggest that the recording of "The Bachelor" was not complete until September or November of 1996, despite the album being released on October 8, 1996. Reives also suggested that one of Lumpkin's first promotional concerts for "The Bachelor"—at the Gorge Amphitheatre near Seattle—occurred in 1997. (Reives Dep. 99:9–100:3.) The actual date of this concert, however, was August 9, 1996.

services to Lumpkin only through "96/97"), 91:21–25 (acknowledging that Hankerson was hired in "late 1996"); Reives Dep. 70:8–22 (recalling that Hankerson was hired "[b]etween '96 and '97").)

Lumpkin learned of Hankerson from Tim Mosley (a/k/a Timbaland), one of three artists, including Lumpkin, with whom Reives had signed management agreements in February of 1996. (Trial Tr. 130:20–131:5.) Mosley had also grown dissatisfied with Reives' unprofessional management style, and had already terminated his professional relationship with Reives. (Lumpkin Dep. 72:16–73:14.)

Reives only learned that Lumpkin had hired a new manager in 1998, more than a year after the parties' decision to part ways. (Reives Dep. 71:1–4, 74:14–19.) Upon learning of this new management relationship, he made no attempt to contact or pursue legal action against Lumpkin. (Id. 74:20–75:2.) He learned of the news during a telephone call from Lumpkin's cousin and felt, at the time, that the news was not supposed to be "covert," noting in his first deposition that it "didn't seem like [Lumpkin's cousin was] telling me something everybody didn't already know except for me." (Id. 75:4–10.) Indeed, at the time he learned of Lumpkin hiring a new manager, Reives no longer even possessed a copy of the Management Agreement, and did not recover a copy of it until at least 2000. (Trial Tr. 118:11–20.)

Although Reives did not contact Lumpkin upon learning that he had hired Hankerson as a new manager (Trial Tr. 93:6–12)—conduct that would have materially breached the Management Agreement had it remained in effect—Reives reacted much more aggressively to an earlier, perceived breach of the Management Agreement, that occurred prior to the parties' decision to mutually abandon that Agreement. Sometime prior to the termination of the Management Agreement, Reives became concerned that Lumpkin's then-attorney, Louise West, was improperly

interfering with the Management Agreement by performing what Reives considered to be managerial functions. (Trial Tr. 98:15–105:16; Reives Dep. 103:11–104:6, 105:22–106:9.)[5] Against Lumpkin's purported protestations otherwise, Reives filed a complaint against West with the New York State Bar. (Trial Tr. 98:15–105:16; Reives Dep. 103:11–104:6, 105:22–106:9.)

That Reives so forcefully policed the scope of the Management Agreement while it was still indisputably in effect undermines his testimony at trial that his passive reaction to Lumpkin hiring Hankerson reflected a belief that the Management Agreement permitted Lumpkin to hire additional managerial support. (Trial Tr. 93:13–21.) As an initial matter, Reives evidenced—both in his depositions and at trial—a consistent lack of familiarity with the specific terms and scope of the Management Agreement. Even assuming he was familiar with the Agreement, however, the Agreement expressly provides—on its first page, and as a distinct provision—that Reives was to serve as Lumpkin's "sole and exclusive manager." (Mgmt. Agreement § 1.) Reives' account would thus require the Court to believe that Lumpkin knowingly hired two separate managers, and was thus paying a separate fee to each—totaling forty percent of his profits—for largely redundant responsibilities. As Lumpkin testified, he was "not savvy when it [came] to that kind of business . . . but [he] wasn't crazy." (Trial Tr. 139:3–7.)

After parting ways in late summer 1996, Reives and Lumpkin did not see one another at all until this trial, aside from two encounters: one, in a New York City club in 2004 or 2005, and another at a Florida recording studio in 2004. (Trial Tr. 90:12–91:20, 114:7–17, 137:16–138:8.) During the first encounter in New York City, Reives and Lumpkin spoke for at least thirty minutes, though neither party could remember the details of their conversation. (Trial Tr. 90:12–91:20.) In the second encounter, Reives and Lumpkin spent several hours together, playing videogames and

---

[5] Neither party remembers the precise timing of this episode, nor is it clear that Lumpkin recalls the episode at all, as he was not directly involved.

talking in a friendly manner. (Trial Tr. 137:20–24.) Reives did not raise the Management Agreement—or his right to payment under the Management Agreement—during either of these encounters. (Trial Tr. 137:25–5.)

Aside from these two encounters, even Reives acknowledges that he and Lumpkin stopped communicating with one another by late 1997. (Trial Tr. 90:1–3, 19–21; Reives Dep. 103:7–12.) As noted above, however, Reives' recollection of this date is ultimately less credible than that of Lumpkin. Thus, the Court finds, as Lumpkin testified, that with the exception of the two encounters described above, the two parties did not see or otherwise speak with each other after their mutual decision to part ways in late summer 1996. (Trial Tr. 137:16–17, 138:6–8.)

Although he did receive $269,461.28 in payments pursuant to the Letter of Direction Reives, never received any payments pursuant to the Management Agreement. (Trial Tr. 11:5–7.) Reives claims to have retained an attorney in the early 2000s to address what he considered to be Lumpkin's breach of the Management Agreement (Trial Tr. 18:10–25), but he did not bring any claims against Lumpkin until the filing of his complaint ("Complaint") in this action, on September 5, 2008, (Dkt. 1). Prior to the filing of the action, Reives never even demanded payment from Lumpkin, nor did he provide any other notice of claim under the Management Agreement. (Trial Tr. 138:9–11.) Furthermore, as of the time of his first deposition in 2012, Reives did not possess any documents related to the Management Agreement aside from a copy of the Agreement itself and a copy of the Letter of Direction. (Reives Dep. 123:14–22.)

\* \* \* \* \*

The findings above largely credit the deposition and trial testimony of Lumpkin over that of Reives as to issues about which the parties offered conflicting testimony. Not only did the Court find Lumpkin more credible based on his demeanor on the witness stand, it found Reives'

testimony at times evasive and at other times inconsistent and contradictory. One example of the inconsistencies in Reives' testimony concerned his residency between 2002 and 2004, which was relevant to the applicability of the statute of limitations.[6] Although the Court's decision ultimately renders this question of residency moot, these inconsistencies undermined the credibility of Reives' testimony more broadly.

In a December 2011 affidavit prepared by Reives independent of counsel, he stated that he had "moved to Miami approximately in the year 2002 but was still spending about half of the year going back and forth between Miami and New York until about 2004 or 2005." (Reives Aff. (Dkt. 54 Ex. C).) In his first deposition, in 2012, Reives offered testimony largely consistent with his prior affidavit, noting that although he had been a resident of Florida "[o]n and off, [for] ten years. I still have places in New York, and I would probably for the first five years travel back and forth six months in New York, six months in Miami." (Reives Dep. 125:19–126:2.) At a second deposition, conducted after Lumpkin raised the issue of residency as a potential bar to Reives' action, Reives insisted this earlier testimony was a mere "generalization" (2d Reives Dep. 11:24–25), and instead claimed to have "never spent more than a month or three, four weeks at a time in Miami between 2002 and 2005," and that his "universe . . . was inside of New York." (2d Reives Dep. 12:7–12.) He further claimed that he was "in New York freezing [his] ass off from 2002 to 2005." (Id. at 13:15–16.)

At trial, Reives attempted to resolve these inconsistencies, explaining that, to him, "moving" to Florida meant not that he became a resident of Florida, but that his person was physically transported to Florida, just as somebody would "move a cup" from one side of the witness stand to the other. (Trial Tr. 107:20–25.) Reives also offered corroborating evidence

---

[6] Under New York's choice of law rules, residency in Florida between 2002 and 2004 would have triggered the Florida statute of limitations and barred any recovery for breach of the Management Agreement.

12

suggesting that he became a Florida resident only in 2007—not in 2002 as claimed in his 2011 affidavit, and not in 2005 as claimed in his second deposition. In addition to these inconsistent dates, testimony from Bassam Quraan, Reives' close friend, that he saw Reives nearly every day in New York between 2002 and 2005 (Trial Tr. 69:22–70:15) conflicts with Reives' already inconsistent claim that he would spend as long as a month (if not six months) at a time in Florida during these years.[7] Testimony by Reives' father, Robert Reives, Sr., though credible, was inconclusive: his testimony evidenced no direct knowledge of Reives' residency during this period, nor of the precise amount of time he was spending in Florida and/or New York.

In addition, Lumpkin's account of the relevant events tracks objectively verifiable dates more closely, such as the October 8, 1996 release of Lumpkin's first album, "The Bachelor," of which the Court takes judicial notice pursuant to Fed. R. Evid. 201. Reives' deposition testimony, by contrast, suggests that his recollection of these events—particularly the parties' professional relationship in the first year after signing the Management Agreement—errs by as much as six months. For the foregoing reasons, evaluating the demeanor of the parties as witnesses, as well as the substance of their testimony, the Court, by a preponderance of the evidence, finds Lumpkin's account of the termination of the Management Agreement more probable.

---

[7] At least two exhibits offered by Reives to circumstantially prove his residency in New York—an e-mail from Bally Total Fitness, the gym where Reives claimed membership during the period in question, and from U.S. Airways, showing the addresses associated with his frequent flyer miles account—were ultimately not considered by the Court, as they were not properly certified by a document custodian, constituted impermissible hearsay, and were only minimally probative. A third exhibit—a 2008 contract addressed to Reives in New York—only undermined Reives' credibility further, as it conflicted with Quraan's corroborating testimony that Reives finally did take up residency in Florida in 2007.

## CONCLUSIONS OF LAW

I adopt herein any Finding of Fact previously set forth that may more properly be deemed a Conclusion of Law.

### I. Legal Standard

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Because Federal subject matter jurisdiction rests on diversity of citizenship, the Court must apply New York choice of law rules. See Stuart v. Am. Cyanamid Co., 158 F.3d 622, 626 (2d Cir. 1998) (citing Guaranty Trust Co. v. York, 326 U.S. 99, 108–09 (1945)). Under these choice of law rules, New York has the most significant relationship with the Management Agreement: it was where the parties met, where the professional relationship underlying the Agreement developed, where the decision to enter into a Management Agreement was made, and where performance—Reives' procurement of the Recording Contract and the parties' decision to waive Reives' initial percentage—occurred. Thus, New York's substantive law of contract applies. See Donninger Const., Inc. v. C.W. Brown, Inc., 979 N.Y.S.2d 133, 134 (N.Y. App. Div. 2014).

Under New York substantive law, contracts for a term of more than one year are subject to the Statute of Frauds and must be in writing. N.Y. Gen. Oblig. Law § 5-701. This requirement, however, does not void a mutual, oral agreement to rescind a contract by abandonment. C.f. N.Y. Gen. Oblig. Law § 15-301 (identifying those circumstances in which termination *cannot* be effected orally); In re 2903 Wines & Spirits, Inc. 45 B.R. 1003, 1008–09 (S.D.N.Y. 1984).

Where parties have abandoned or ignored a contract, it is unenforceable. See In re Schanzer's Estate, 182 N.Y.S.2d 475, 479 (N.Y. App. Div. 1959), aff'd sub nom. Matter of Schanzer's Estate, 169 N.E.2d 11 (N.Y. 1960). In such cases, a later cause of action for breach is typically barred, and will only lie where the agreement of the parties to terminate the contract

expressly or impliedly reserved a later cause of action. See M.J. Posner Const. Co. v. Valley View Dev. Corp., 499 N.Y.S.2d 997, 999 (N.Y. App. Div. 1986).

Whether a contract has been rescinded by abandonment is a question of fact. See Graham v. James, 144 F.3d 229, 238 (2d Cir. 1998); Cauff, Lippman & Co. v. Apogee Fin. Grp., 807 F. Supp. 1007, 1021 (S.D.N.Y. 1992). The party asserting such a defense has the burden of proving it, and abandonment will not be presumed. 144 F.3d at 238.

Abandonment will only be found where there is mutual assent by the parties. Id. This intent, however, "need not be manifested expressly." Jones v. Hirschfeld, 348 F. Supp. 2d 50, 59 (S.D.N.Y. 2004). Instead, it can be "inferred from the attendant circumstances and conduct of the parties." Armour & Co. v. Celic, 294 F.2d 432, 435 (2d Cir. 1961). Where conduct alone is the basis for a finding of abandonment, "the acts of the parties must be positive, unequivocal and inconsistent with an intent to be further bound by the contract." Id. at 436. Courts will impute such a mutual intent to abandon even where only one party acts in an inconsistent manner, and the other party merely acquiesces. See C3 Media & Mktg. Grp. v. Firstgate Internet, Inc., 419 F. Supp. 2d 419, 433 (S.D.N.Y. 2005). That one party has breached the contract, however, is alone insufficient to establish abandonment. See Carver v. Apple Rubber Prods. Corp., 558 N.Y.S.2d 379, 380 (N.Y. App. Div. 1990).

Rescission by abandonment can also be found where a mutual agreement to terminate the original contract occurs simultaneously with the agreement to enter into a new contract—written or oral—concerning the same subject matter. Jones v. Trice, 608 N.Y.S.2d 688, 688 (N.Y. App. Div. 1994). In such cases, both the mutual agreement to terminate and the new contract require consideration. See Strychalski v. Mekus, 388 N.Y.S.2d 969, 970 (N.Y. App. Div. 1976). In the

15

Case 1:08-cv-07797-RA Document 105 Filed 01/30/15 Page 16 of 18

case of the former, "the mutual consent of the parties to rescind is ordinarily all the consideration required." Id.

## II. Discussion

Here, the Court finds—as a matter of fact—that Lumpkin has satisfied his burden of proof and sufficiently demonstrated that the parties mutually agreed to abandon the Management Agreement in late summer of 1996.[8] The Court further finds that this abandonment precludes Reives' current action for breach as a matter of law.

The parties' telephone conversation in late summer 1996 in which they agreed to go separate ways—Lumpkin's testimony about which the Court credits as true—constituted an express disavowal of the Management Agreement and indicated the intention of both parties to no longer be bound by the terms and scope of the Agreement. Even were this conversation not to amount to express abandonment, the parties' subsequent actions were inconsistent with an intent to be bound by the Management Agreement, such that abandonment can be implied. Indeed, were the contract not abandoned, Lumpkin would have materially breached the Management Agreement after late summer 1996—both by failing to pay twenty percent of "gross monies" to Reives despite a provision requiring prompt payment and by hiring Hankerson despite an express provision naming Reives his sole and exclusive manager. Reives, meanwhile, did not bring an action on these purported breaches until 2008, several years after first consulting an attorney, more than a decade after first learning that Lumpkin had hired another manager, and approximately twelve years after any initial payments would have been due under the Agreement.

---

[8] Prior to trial, Reives urged the Court to find that Lumpkin had waived the right to raise affirmative defenses, arguing that he had failed to raise them previously. Because Lumpkin, however, had raised the defenses of waiver and accord and satisfaction in his Answer (Dkt. 41), the Court found that these defenses—as well as any other defenses that depended on a similar set of facts, including abandonment—would not prejudice Reives and were proper issues for trial.

16

In fact, Reives never raised these purported breaches with Lumpkin at all, failing to do so even during two indisputably friendly encounters in 2004 or 2005, both of which occurred several years after Reives purportedly learned of his alleged contractual rights and hired an attorney to bring an action. Thus, while Reives was not required to perform under the Management Agreement without a specific written request by Lumpkin, his conduct after late 1996 constitutes tacit but unmistakable assent to Lumpkin's abandonment of the parties' contract.

This conclusion is supported by the Court's finding that the Letter of Direction—although not executed simultaneously with the parties' late summer 1996 telephone conversation—served as consideration for the mutual agreement to abandon, and that no subsequent right of action for breach of contract was thus preserved by Reives. The Letter of Direction, coupled with the First Look Agreement provided by Sony for Lumpkin's benefit, effectively superseded the Management Agreement, and enabled both parties to terminate that Agreement without acrimony and without the need to preserve any residual claims.

Reives' claim that the Letter of Direction and First Look Agreement merely supplemented the Management Agreement is unpersuasive. Although he did serve as the Executive Producer—and not just as Lumpkin's manager—for "The Bachelor," the Management Agreement entitled Reives to twenty percent of royalties received by Lumpkin for this album and others produced "as a result of" Reives having procured the original Recording Contract. That either the Letter of Direction or the First Look Agreement supplemented the Management Agreement is also inconsistent with Sony's, as well as Lumpkin's, growing frustration with Reives. Rather, it is far more likely, as the Court finds, that both contracts were executed to resolve these frustrations by permitting Lumpkin to dissolve his professional relationship with Reives while ensuring that

Reives still received compensation for procuring the Recording Contract, and by allowing Sony access to Reives' roster of artists without having to interact with him in a managerial capacity.

## CONCLUSION

For the reasons stated above, the mutual dissolution of the Management Agreement constituted rescission by abandonment, and no right of action was preserved by the parties. Reives' action here is thus barred, and the Court enters judgment in favor of Lumpkin.

Consistent with Fed. R. Civ. P. 54(d)(1), it is hereby ordered that all costs consistent with 28 U.S.C. § 1920 are awarded to Lumpkin. Pursuant to Local Rule 54.1, Lumpkin shall file with the Clerk of this Court a notice of taxation of costs indicating the date and time of taxation and annexing a bill of costs, at which time Reives will be permitted to raise any objections. In addition, Lumpkin shall have 14 days to move for attorney's fees under Fed. R. Civ. P. 54(d)(2), the Court's adjudication of which will be governed by New York law. See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 177 (2d Cir. 2005).

SO ORDERED.

Dated:   January 30, 2015
         New York, New York

_____
Ronnie Abrams
United States District Judge